IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CAROLE SRAVER                                 :
                                              :
        v.                                    :     Civil No. CCB-05-1331
                                              :
SURGICAL MONITORING                           :
SERVICES, INC.                                :

## MEMORANDUM

Plaintiff Carole Sraver claims damages in a sexual harassment action filed against her former employer, Surgical Monitoring Service, Inc. ("SMS"). Sraver alleges she was subjected to a hostile work environment and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. Now pending is SMS's motion for summary judgment. The parties have fully briefed the motion and no hearing is necessary. Local Rule 105.6. For the reasons that follow, I will grant SMS's motion with regard to the hostile work environment claim (Count I), and deny SMS's motion with regard to the retaliation claim (Count II).

## BACKGROUND

This action arises out of Sraver's employment with SMS, a provider of intraoperative monitoring services. The corporate office of SMS is located in Cockeysville, Maryland. Dr. Jeffrey Owen founded SMS in 1995 and remains part owner.

On or about December 4, 2000, Sraver began working as a full-time billing manager for SMS. Sraver's duties included, but were not limited to, setting up the in-house billing system and establishing procedures so that bills for services could be submitted in a timely fashion. The

1

bills for medical services were submitted to various insurance carriers, including Medicaid and Medicare.  In order to secure reimbursement for the rendered medical services, it is necessary that the billing be done on a timely basis.  Reimbursements submitted late could be denied.

Sraver alleges that beginning around her first week of employment, Owen subjected her to unwelcome sexual harassment in the form of sexually suggestive questions and derogatory sexual remarks.  On a regular basis, Owen would greet Sraver by saying, "Good morning/good afternoon, Carole, did you get laid last night?" or "How's the sex life?" or questions to that effect.  Sraver responded by telling Owen that his comments were uncalled for, and that it was none of his business, or she would walk away.  Owen would pose these questions to Sraver throughout SMS's offices, but outside the vicinity of other employees.

Owen admits that on one occasion in October 2001, after Sraver inquired about a bonus, he responded by saying, "You'll get a bonus when I get a blow job."  Two other employees – Joan Meo and Janet Taylor – heard this comment and laughed.   Def. Mot., Ex. 6 at ¶ 5; *Id.,* Ex. 7 at ¶ 6.  There is no dispute that Owen quickly realized his comment was inappropriate and apologized.  *Id.*, Ex. 2 at 67; *Id.,* Ex. 7 at ¶ 6.

In or about December 2002, Sraver was on a conference call with Owen and Lee McNinch, Chief Operator of Intra-Operative Monitoring, wherein Owen informed Sraver that he had a present for her.  When Sraver asked what it was, Owen said it was "about six inches long with a gold tip and to stop by anytime to pick it up."  Pl. Opp., Ex. 1 at 72; Ex. 2 at ¶ 12.  Though Sraver admits that she could not identify the "gift," she hung up the telephone.  When Sraver went to the other side of the office complex for a meeting, Owen handed her a pen, laughed and asked, "Wasn't that funny?"

2

Sraver also alleges that Owen would noticeably glance at her breasts. She asserts that beginning in or about January 2002, Owen commented on her breasts approximately two to three times a month. On one occasion, Owen said to Sraver, "Your boobs are bigger than my wife's," and informed her that he liked big-breasted women.

Finally, on at least three or four occasions between September 2002 and June 2003, Owen said, "I am on a liquid diet to make my dick look bigger" during executive staff meetings. Pl. Opp., Ex. 1 at 75, 77; Ex. 2 at ¶¶ 9, 14, 18. Sraver alleges that at the conclusion of a meeting on June 9, 2003, where Owen commented on his liquid diet, she complained to Thomas Filling, SMS's Human Resources Director. Sraver told Filling, "Enough. These [Owen's inappropriate remarks] have to stop. The comments are getting out of control." Pl. Opp., Ex. 1 at 79; Ex. 2 at ¶ 19. In response, Filling said, "I know. It's not as bad as it used to be, and I'll take care of it." *Id.*, Ex. 1 at 81; Ex. 2 at ¶ 20.[1] Sraver says she found Owen's continuous expression of sexually explicit comments to be offensive.

Sraver also complained about Owen's comments to Elizabeth Gotjen, her personal friend, who was initially employed as SMS's Human Resources & Media Assistant and later promoted to Director of Human Resources. According to Gotjen, Sraver complained about Owen's statement, "You'll get a raise when I get a blow job," and the incident wherein Owen "referenced a pen as a phallus over the intercom system." *Id.,* Ex. 1 at 14-16. Sraver made these comments to Gotjen at a Baltimore Ravens football game, where they both worked a second job as hostesses, in December 2002. Gotjen did not report the incident to Filling, her supervisor,

---

[1] Sraver asserts that she complained to Filling about Owen's sexual comments on prior occasions but, despite Filling's assurances, the sexually offensive comments continued on a daily basis. Compl. 19.

because she was under the impression that Sraver had already reported Owen's inappropriate sexual remarks to him.

Despite the alleged sexual harassment by Owen, Sraver prospered financially while in the employ of SMS. Over the course of two and one-half years, her annual salary increased from $50,000 to $70,000. She also received monetary bonuses during the course of her employment totaling almost $16,000 and, in 2001, when she was having difficulty making her mortgage payments, SMS provided her with a $6,000 interest-free loan. Sraver, moreover, elected to stay with SMS, despite job offers from other employers. She also recruited two of her friends – Gregg Wavle and Gotjen – to work at SMS.

On or about June 11, 2003, shortly after Sraver complained about Owen's sexual remarks, she met with Filling and Janet Deal, Director of Finance. During the meeting, Filling handed Sraver a resignation letter falsely stating that she was looking for employment closer to home. After Sraver refused to sign the letter, Filling told her that her services were no longer needed, to vacate the premises immediately, and to call him to schedule a time to come back and retrieve her belongings. SMS asserts that Sraver was terminated on June 11, 2003, because it was discovered by Deal that Sraver had erroneously concluded that a letter from one state insurance entity concerning its reimbursement procedures was applicable to other state insurance entities. It was not. As a consequence, Sraver failed to submit bills for reimbursements for services during 2001 and 2002 that totaled almost $5 million. When the effect of Sraver's erroneous decision was brought to the attention of Owen, he agreed with Deal's recommendation to terminate Sraver. At no time during the course of the June 11th meeting, however, did Filling or Deal make any comment to Sraver regarding her alleged failure to submit bills for

4

reimbursement for services during 2001 and 2002. Indeed, neither Filling nor Deal provided Sraver *any* reason for her termination. Sraver believes that she was terminated in retaliation as a result of her continued complaints about the alleged sexual harassment and hostile work environment that she was subjected to by Owen.

**ANALYSIS**

I.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002),

but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

II      Hostile Work Environment

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). "When [a] workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal citations and quotations omitted).  To state a prima facie case of sexual harassment based on an abusive or hostile work environment, a plaintiff must show: (1) that she was harassed because of her sex; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer. *Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 772 (4th Cir. 1997) (citing *Wrightson v. Pizza Hut of Am.,* 99 F.3d 138, 142 (4th Cir. 1996)).  The offensiveness of the work environment is evaluated from both the subjective standpoint of the plaintiff and the objective standpoint of a reasonable person in the plaintiff's position. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998).  In determining whether the environment was hostile, factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work environment." *Id.* at 787-88 (citing *Harris,* 510 U.S. at 23). The standards for judging hostility are such that complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are filtered out so that Title VII does not become a "general civility code." *Faragher,* 524 U.S. at 788 (citations omitted).

Sraver's allegations fail, as a matter of law, to satisfy the third step, as the events catalogued by Sraver are insufficient to satisfy the requirement "that the harassment was sufficiently severe or pervasive to create an abusive working environment." *Wrightson,* 99 F.3d at 142. While Owen's remarks clearly were inappropriate and offensive, they are not of the same magnitude as the comments and behavior that the Fourth Circuit has found sufficient to establish actionably severe or pervasive harassment.

For example, in *Smith v. First Union National Bank,* 202 F.3d 234 (4th Cir. 2000), the Fourth Circuit reversed the entry of summary judgment for the defendant-employer where it was shown that the plaintiff's supervisor directed "a barrage of threats and gender-based insults" at her more than 30 times in the first few weeks of her employment. *Smith,* 202 F.3d at 238. The supervisor routinely directed demeaning comments at women, such as stating that the only way a woman could get ahead at the bank was to "spread her legs." *Id.* at 239. The supervisor, moreover, told plaintiff that she should carry out his orders "or else," and that he could "see why a man would slit a woman's throat." *Id.* The latter comment was made after he spun the plaintiff around in her chair to face him. *Id.* Similarly, in *Ocheltree v. Scollon Productions, Inc.* 335 F.3d 325 (4th Cir. 2003) (en banc), the plaintiff was subjected to daily vulgar talk and the antics of male colleagues in a work environment where the plaintiff was the sole female

7

employee. The plaintiff's male colleagues simulated sex acts on mannequins, directed vulgar and sexually explicit jingles at the plaintiff, and presented her with graphic pornography. *Id.* at 328-329, 333. *See also EEOC v. R&R Ventures,* 244 F.3d 334, 337-40 (4th Cir. 2001) (male supervisor directed daily sexual jokes and discussions of sexual positions at 15-year-old employee, asked her if she liked to be spanked, and frequently said women were stupid compared to men; same supervisor constantly flirted with a 20 year-old employee, repeatedly made sexual comments to her, and belittled her in front of her co-workers); *Conner v. Schrader-Bridgeport Int'l, Inc.,* 227 F.3d 179, 193-99 (4th Cir. 2000) (female employee was regularly mocked, ridiculed, and physically threatened by male co-workers, and was forced to remove the rags covering bloodstains in her pants after suffering uterine bleeding).

Instead, Sraver's complaints are more like the incidents alleged in *Hartsell,* 123 F.3d 766. In that case, the Fourth Circuit affirmed the entry of summary judgment for the employer where, over a three-month period, the female plaintiff's male co-workers made the following comments: (1) that the male employees had made every female employee "cry like a baby" and would do the same to her; (2) that more "buxom" women were needed at the office; (3) asking the plaintiff if she would become a "mini van driving mommy;" and (4) that plaintiff should go home to "fetch [her] husband's slippers like a good little wife." *Hartsell,* 123 F.3d at 773. The court explained that the plaintiff's allegations "demonstrate only that [her co-workers] were unpleasant and sometimes cruel." *Id.* at 772. Simple teasing, sporadic use of abusive language, off-hand comments, gender-related jokes, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher,* 524 U.S. at 788. Owen's behavior – like the behavior alleged in *Hartsell* – falls into these

8

categories.

This case, moreover, is like *Hartsell,* and unlike *Smith,* in an important respect: the behavior in *Smith* included physically threatening behavior, whereas *Hartsell* and the instant case do not. *Smith,* 202 F.3d at 243. Further, the "liquid diet" comments, as well as the "blow job" comment, were not directed at Sraver exclusively. Instead, in all instances, the comments were directed at several people, and with regard to the "liquid diet" comments, the group included both women and men. The Fourth Circuit has indicated that such second-hand harassment, although relevant, is less objectively abusive than harassment directed only at the plaintiff. See *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (affirming summary judgment partly on the basis that some of the supervisor's conduct and sexual comments took place in group settings and were not directed at the plaintiff). In short, allowing Sraver to pursue a cause of action under these circumstances would not be consistent with controlling Fourth Circuit law.

Sraver also has failed to demonstrate that Owen's comments unreasonably interfered with her work environment. Sraver contends that she experienced anxiety, chest and stomach pains, indigestion, sleeplessness, and emotional distress as the result of Owen's alleged harassment. No diagnosis of Sraver's physical and mental ailments was made by a medical professional, however, and these alleged mental and physical ailments apparently had little or no effect on Sraver's job performance. Indeed, while Sraver worked at SMS, her annual salary increased from $50,000 to $70,000. She also received monetary bonuses during the course of her employment totaling almost $16,000 and, in 2001, SMS provided her with a $6,000 interest-free loan. The bonuses were tied to Sraver's job performance. Further, Sraver elected to stay with

9

SMS, despite job offers from other employers, and she was even named "Employee of the Month" in April 2002.[2]

There is no question that Owen's behavior, as alleged by Sraver, was offensive. There also is no question that his comments were inappropriate in the workplace. That said, "the workplace [Sraver] describes, though crude, is not the hellish environment against which Title VII protects." *Greene v. A Duie Pyle, Inc.,* 371 F.Supp.2d 759, 763 (D. Md. 2005). Thus, while I do not condone such behavior, I must grant summary judgment on the hostile work environment claim to SMS.

II    Retaliation

Sraver alleges that SMS retaliated against her for reporting sexual harassment by terminating her employment. To prove a *prima facie* case of retaliation, Sraver must show that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland,* 243 F.3d 858, 863 (4th Cir. 2001). Once Sraver establishes the elements of her *prima facie* case, the burden shifts to SMS to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action. If the employer carriers its burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered were pretextual. With regard

---

[2] SMS asserts that if Sraver truly was being harassed by Owen, she would not have encouraged her two friends – Gregg Wavle and Elizabeth Gotjen – to join SMS. But Wavle, as a man, was unlikely to encounter sexual harassment by Owen. Gotjen, though a woman, had recently lost her job and was looking for new employment. It was reasonable for Sraver to recommend employment with SMS – particularly given that Gotjen was uniquely qualified for an open position – given that any job, even a job with a supervisor who makes rude and offensive comments, is better than no job at all.

to pretext, the Supreme Court has held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148.

Sraver alleges that she engaged in a protected activity when she complained about Owen's comments to Filling and Gotjen. To determine whether Sraver engaged in a protected activity, the court must ascertain whether Sraver subjectively believed that SMS was violating Title VII and whether Sraver's subjective belief was objectively reasonable in light of the facts. *See Peters v. Jenney,* 327 F.3d 307, 321 (4th Cir. 2003). If Sraver held a reasonable belief, she may maintain her retaliation claim even though she cannot maintain a claim for hostile work environment. *Greene,* 371 F.Supp.2d at 764. Sraver clearly had a subjective belief that she was being sexually harassed. Likewise, while Owen's behavior does not cross the threshold into illegal sexual harassment under Fourth Circuit law, it certainly comes close. Indeed, if Sraver's allegations are true, she was regularly subjected to a series of offensive, unprofessional, and highly inappropriate remarks, all of which were of a sexual nature. Thus, under these circumstances, it was objectively reasonable for Sraver to believe that she was engaging in a protected activity when she complained to Filling and Gotjen.

According to Sraver, she complained to Filling about Owen's "liquid diet" comment after a staff meeting on June 9, 2003, two days before she was terminated. This complaint, she alleges, precipitated her firing. SMS, in response, alleges that Owen was not at the defendant's corporate offices on June 9, 2003. The defendant has produced hotel receipts, car rental receipts, and plane tickets demonstrating that Owen and his wife were in Texas on June 9, 2003. In other words, SMS alleges that Sraver fabricated her retaliation claim. Notably, however, the

11

defendant does not claim that these staff meetings never took place, or that Owen did not make the "liquid diet" comment on another date, or that Sraver did not complain about the comment to Filling. Filling, moreover, was unable to recall in his deposition whether Sraver complained about Owen's comments. Pl. Opp., Ex. 5 at 27. SMS apparently rests its defense on the fact that Sraver alleged the wrong date.

Sraver counters that her failure to remember the exact date of the "liquid diet" comment should not undermine her retaliation claim. I agree. In her deposition, Sraver was able to describe the parties in attendance, where she sat relative to Owen, to whom she spoke, and other details. Def. Mot. Summ. J., Ex. 4 at 74-76. SMS never asserts that the meeting did not take place, or that the comment was never made. Sraver's failure to remember the correct date of the meeting therefore is a question of credibility, which must be determined by the factfinder.

Sraver also has satisfied the second element: her termination by SMS was an adverse employment action. Regarding the third element, "the closeness in time between" the protected activity and the adverse employment action is sufficient to make a *prima facie* showing of a causal link. *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir. 1998). Within a short period of time after complaining about Owen's sexual remarks, Sraver was terminated. Therefore, Sraver has established the final element of her *prima facie* case.

SMS defends its actions on the basis that it had a legitimate and non-discriminatory reason for terminating Sraver. According to SMS, Sraver erroneously concluded that SMS could not submit for monetary reimbursement certain medical services provided by SMS, resulting in a loss of almost $5 million in revenue. This is a serious allegation. The Supreme Court, however, has held that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the

falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves* 530 U.S. at 147; *see also EEOC v. Sears Roebuck and Co.,* 243 F.3d 846, 852-53 (4th Cir. 2001) (employer's shifting reasons for adverse employment action is, in and of itself, probative of pretext).

There are two reasons why SMS's explanation might be pretextual. First, on the last day of Sraver's employment, she met with Filling and Deal. During the meeting, Filling handed Sraver a resignation letter falsely stating that she was looking for employment closer to home. After Sraver refused to sign the resignation letter, Filling informed her that her services were no longer needed, told her to vacate the premises immediately, and told her to call him to schedule a time to come back and retrieve her belongings. At no time during the course of the meeting did Filling or Deal make any comment regarding her alleged failure to submit bills for reimbursement for services during 2001 and 2002. It was not until the end of September or the beginning of October 2003 that Sraver learned that Owen told other employees he terminated her because of an alleged failure to submit bills for reimbursements. While SMS was not obligated to explain its reasons for terminating Sraver, one would think that if SMS based the termination on the lost reimbursements, they would notify her of this fact. SMS offers no explanation for its failure to inform Sraver of the reason for her termination or for the false representations in the proffered resignation letter.

Second, Sraver asserts that the decision to follow the advice from the state insurance entity concerning its reimbursement procedures was a joint decision made by SMS's Medical Director, its attorney, Owen, and Sraver. As a manager, Sraver did not have the final say with respect to such decisions and merely followed any instruction she was given. SMS does not

13

refute Sraver's assertion that the decision was jointly made. Thus, what SMS proffers as a legitimate and non-discriminatory reason for terminating Sraver might instead be post hoc justification to mask the real reason for firing her, which was retaliation for her complaints about Owen. This is a conflict that should be resolved by a jury. I will therefore deny SMS's motion for summary judgment on the retaliation claim.

  A separate Order follows.

| July 27, 2006 | /s/ |
|---|---|
| Date | Catherine C. Blake |
| | United States District Judge |